UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LINDA WOOTEN,

     Plaintiff,

       v.

MAINE TURNPIKE AUTHORITY,

     Defendant.

Civil Action No.

<u>COMPLAINT</u>
<u>JURY TRIAL REQUESTED</u>
<u>INJUNCTIVE RELIEF REQUESTED</u>

NOW COMES the Plaintiff, Linda Wooten ("Ms. Wooten"), by and through undersigned counsel, and complains against the Defendant, Maine Turnpike Authority ("MTA"), as follows:

<u>JURISDICTION AND PARTIES</u>

1.     This action arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; the Whistleblowers' Protection Act ("WPA"), 26 M.R.S. §§831 *et seq.*, as enforced through the MHRA; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*; the Maine Family Medical Leave Requirement Act ("MFMLR"), 26 M.R.S. §§ 844 *et seq.*; and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*

2.     Ms. Wooten is a United States citizen residing in the City of Auburn, County of Androscoggin, State of Maine.

3.     MTA is an independent quasi state agency charged with constructing and maintaining the Maine Turnpike, a highway between Kittery and Augusta, Maine.

4.     MTA had 15 or more employees for each working day in each of 20 or more calendar weeks in the same calendar year as when the alleged discrimination occurred.

5.      This Court has subject matter jurisdiction over Ms. Wooten's federal and state claims pursuant to 28 U.S.C. §§ 1331and 1367.

6.      On or about January 11, 2022, Ms. Wooten filed a timely Complaint/Charge of Discrimination against the MTA alleging unlawful age and disability discrimination, retaliation, and whistleblower retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

7.      On or about April 20, 2023, the MHRC issued a Notice of Right to Sue with respect to Ms. Wooten's state law claims.

8.      On or about April 27, 2023, the EEOC issued a Notice of Right to Sue with respect to Ms. Wooten's federal law claims.

9.      Ms. Wooten has exhausted her administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

10.     Ms. Wooten requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

11.     Ms. Wooten worked for MTA for almost 20 years before she was wrongfully terminated on November 3, 2021.

12.     Douglas Davidson is MTA's Treasurer and Chief Financial Officer.

13.     Lauren Carrier is MTA's Director of Human Resources.

14.     Cecile Champagne-Thompson is MTA's Assistant Director of Human Resources.

15.     Richard Somerville is MTA's Director of E-ZPass Operations.

16.     Pamela Lambert is one of MTA's E-ZPass Managers.

17.    Ms. Wooten started working for MTA on June 11, 2002 as an on-call Toll Collector-I.

18.    Ms. Wooten's starting rate of pay was less than $12 per hour.

19.    Ms. Wooten's performance was always satisfactory during her employment.

20.    Ms. Wooten was qualified for the jobs she held while employed by MTA, with or without reasonable accommodations.

21.    Ms. Wooten was hired for a full-time Toll Collector-I position on January 19, 2003.

22.    Ms. Wooten performed well in her position.

23.    In February 2015, Ms. Wooten was promoted to E-ZPass Customer Service Representative (CSR).

24.    Ms. Wooten's pay was increased to $21.20 per hour.

25.    Ms. Wooten's final rate of pay at the time of her wrongful termination was $25.70.

26.    Ms. Wooten was 61 years old when she was wrongfully terminated.

27.    In January 2018, MTA agreed to pay for Ms. Wooten to take classes toward a Bachelor's Degree in Business Administration because the classes were consistent with the MTA's business needs.

28.    Mr. Davidson told Ms. Wooten that he envisioned promoting Ms. Wooten to a supervisor position at a new facility in West Gardiner where Ms. Wooten would earn a considerably higher wage.

29.    MTA agreed to reimburse Ms. Wooten for classes she took in Fall 2017.

30. MTA promised that if Ms. Wooten continued to earn grades B and higher, she would also be reimbursed for her future classes and books all the way to earning her degree.

31. Ms. Wooten had to take FMLA/MFMLR followed by additional medical leave under the ADA and MHRA from June 2019 to October 2019 due to pain from osteoarthritis in her right hip and back.

32. Ms. Wooten's condition was a serious health condition under the FMLA and MFMLR. Her condition required inpatient care in a hospital and continuing treatment by a medical provider.

33. Ms. Wooten's condition was a disability under the ADA and MHRA, particularly when viewed without mitigating measures. Her condition made it difficult for her to walk. Ms. Wooten had difficulty sitting or standing for long periods of time. She had to use a cane for mobility. She was receiving physical therapy and other treatments.

34. During the June to October 2019 time frame, Ms. Wooten's late husband became terminally ill and died and she was grieving her loss.

35. Ms. Wooten was released to return to work on October 1, 2019, with reasonable accommodations including a chair with no wheels, use of a cane as needed, and a sit/stand desk for pain relief.

36. Ms. Wooten provided MTA with two doctor's notes stating that she could return to work with these accommodations.

37. MTA refused to provide Ms. Wooten with reasonable accommodations that would allow her to return to work on October 1, 2019.

38. Ms. Wooten was not allowed to return to work until October 18, 2019, after she submitted a doctor's note stating that she had no restrictions and did not need accommodations.

39.    Ms. Wooten paused from taking classes while she was on medical leave during 2019.

40.    Mr. Davidson told Ms. Wooten that if an employee dropped a class or got an incomplete, MTA would not pay education benefits again until the employee passed another class with a "B" or made up the class at the employee's expense and passed with a "B".

41.    The E-ZPass department began providing "no time" benefits to employees beginning in January 2020.

42.    "No time" is a type of discretionary, unpaid sick leave that MTA used for employees who needed time off from work but did not have accrued paid sick time.

43.    Ms. Wooten first benefited from "no time" on January 31, 2020.

44.    A co-worker, AN, got sick and needed medical leave.

45.    Ms. Wooten got sick after AN and was granted time off even though she had exhausted her FMLA/MFMLR benefits in 2019 and had no accrued sick or vacation time off.

46.    Ms. Wood's supervisor, Tanya Cawood, and Mr. Somerville approved "no time" for Ms. Wooten to leave work and get treated for illness.

47.    Ms. Wooten was out for one business day and returned to work the following Monday.

48.    Ms. Cawood told Ms. Wooten that the "no time" policy was going to be used to help MTA get through the COVID pandemic.

49.    Ms. Cawood told Ms. Wooten that employees were not to be disciplined for using "no time" when they did not have FML benefits, vacation, or sick time to be absent.

50.    Ms. Wooten enrolled in classes again in 2020.

51.    When she asked MTA to pay for the classes, MTA refused.

52.     In a letter dated May 29, 2020, Ms. Carrier told Ms. Wooten that her integrity was doubted and that "it appears you have manipulated" both programs, meaning, FMLA/MFMLR and MTA education benefits.

53.     Ms. Carrier's allegation was unfounded and evidences animus by Ms. Carrier towards Ms. Wooten and her use of protected medical leave.

54.     Ms. Wooten continued her education, received good grades, and asked MTA again in May 2021 for financial help with her education.

55.     In a letter dated May 10, 2021, Ms. Carrier wrote that no further investment in Ms. Wooten's education would be approved by MTA because of "the lack of a specific development plan identifying how the investment in [her] education supports [her] preparation for a current or future Authority position that [she] would realistically move into."

56.     MTA had never required Ms. Wooten to have a specific development plan when it promised to pay her for classes toward a Bachelor's Degree in Business Administration.

57.     MTA treated Ms. Wooten differently and worse after she disclosed her disability and used protected medical leave.

58.     The MTA reneged on its promise to pay for Ms. Wooten's education due to FMLA/FMLR retaliation, disability discrimination and because of her request and need for medical leave as a reasonable accommodation.

59.     Ms. Wooten needed time off for right hip replacement surgery in January 2021.

60.     Ms. Wooten's leave of absence lasted from January 11, 2021 to March 22, 2021.

61.     Ms. Wooten's absence was job-protected under the FMLA and MFMLR.

62.     Ms. Wooten's medical leave of absence was a reasonable accommodation under the MHRA and ADA.

63.    Ms. Wooten's surgery was on January 28, 2021.

64.    After her surgery, Ms. Wooten needed physical therapy.

65.    Ms. Wooten's attendance was very good after she returned to work.

66.    There were a few days she needed and used "no time" after her return to work.

67.    The E-ZPass department was hard-hit during the pandemic.

68.    At times almost 80% of the department was out of work for COVID-19 related reasons such as their own illness or exposure to someone who had COVID-19.

69.    Ms. Wooten worked on a skeleton crew to keep the office functioning.

70.    Ms. Wooten worked overtime to help carry the workload when only a handful of representatives were able to work.

71.    Despite the pandemic, MTA permitted the public to use its common areas. Members of the public used MTA's restrooms and lobby and had contact with employees.

72.    During the week of September 20-24, 2021, there were only five or six representatives working in the E-ZPass Department because so many employees were out sick or needed to quarantine.

73.    Ms. Wooten contracted COVID-19 in the workplace.[1]

74.    Ms. Wooten did not have any accrued sick leave and had used her FMLA/MFMLR benefits for her right hip replacement earlier that year.

75.    Ms. Wooten went to work on Monday, September 27, 2021, but she did not feel well. After about half an hour, Ms. Wooten told Ms. Lambert that she was not feeling well and needed to leave.

---

[1] Ms. Wooten alleged in a petition for Workers' Compensation benefits that she contracted COVID-19 at the workplace. MTA denied and disputed that Ms. Wooten contracted COVID-19 at the workplace. On February 2, 2023, the Workers' Compensation Board granted Ms. Wooten's petition for benefits and found that Ms. Wooten contracted COVID-19 in the workplace.

76.     Ms. Wooten told Ms. Lambert she would need to use "no time". Ms. Lambert said, "Ok."

77.     Later that day (Monday, September 27, 2021), Ms. Wooten emailed Ms. Lambert:

"Hello Pam, I contacted my pcp today when I got home and scheduled a covid test for tomorrow at 11:45. So, I won't be in Tuesday morning. I'll need to use no time and will keep you posted."

78.     Ms. Lambert did not respond to Ms. Wooten's email and did not inform her that she could not use "no time" while she was out sick with possible COVID-19.

79.     Ms. Wooten tested positive for COVID-19 on September 28, 2021. Her medical provider wrote a note stating,

"Due to [Linda Wooten's] POSITIVE COVID test today in our respiratory clinic, it is our recommendation that patient practice self-isolation for the next 10 days in the form of self-quarantine at home…."

80.     Ms. Wooten's initial symptoms were not too bad. She experienced fatigue, fever, cough, and night sweats.

81.     Ms. Wooten called the Safety Coordinator, Arlo Pike, at about 12:30pm on September 28, 2021, to let him know about her positive COVID-19 test. She told Mr. Pike that she would get a note and forward it to MTA.

82.     Ms. Wooten was upset that she contracted COVID-19 at work and reported to Mr. Pike how disappointed she was that MTA did not provide her and other employees with a safe work environment.

83.     MTA claims that Ms. Wooten was rude and upset during her phone call with Mr. Pike. Ms. Wooten admits that she was upset, but not rude.

84.     Ms. Wooten complained to Mr. Pike that employees were not warned that there was a COVID-19 outbreak in the department.

85.     Ms. Wooten told Mr. Pike she was disappointed with MTA's decision to remain open to the public.

86.     Ms. Wooten told Mr. Pike that she was calling the Center for Disease Control to report the outbreak at the MTA.

87.     Mr. Pike told Ms. Wooten that he was not in control of the decision to close MTA headquarters or keep it open.

88.     Ms. Wooten's report to Mr. Pike was protected activity under the WPA. Ms. Wooten believed that MTA's decision to remain open to the public put her and other employees at risk. Ms. Wooten reported her concerns to Mr. Pike to shed light on the risk it posed to employees and in hopes that by reporting her concerns that MTA would stop the unsafe practice.

89.     Mr. Pike called Ms. Wooten back about fifteen minutes later and asked her for the names of everyone she was in contact with while at work on September 27, 2021.

90.     The only names were Ms. Lambert and Mr. Somerville because so many employees were out sick or in quarantine.

91.     Ms. Wooten called Ms. Lambert on September 28, 2021 and left a message, letting Ms. Lambert know that her COVID-19 test was positive and to see if she could work remotely.

92.     Ms. Wooten also let Ms. Lambert know that she (Ms. Wooten) would be applying for workers' compensation.

93.     Ms. Lambert did not call Ms. Wooten back.

94.     Ms. Wooten called and left the same message for Ms. Thompson on September 29, 2021.

95.     Ms. Lambert and/or Ms. Thompson apparently forwarded Ms. Wooten's message to Mr. Somerville.

96.     Mr. Somerville called Ms. Wooten on September 29, 2021 and left a message asking her to call him back. Ms. Wooten returned Mr. Somerville's call on September 29, 2021, at about 9:11 AM.

97.     Ms. Wooten told Mr. Somerville about her illness.

98.     Ms. Wooten asked for permission to work remotely like the supervisors were doing while out sick with COVID-19.

99.     Mr. Somerville denied Ms. Wooten's request, stating that MTA was not set up for CSRs to work remotely.

100.    Ms. Wooten's request to work from home was a request for reasonable accommodation that did not eliminate any essential functions of her job and did not pose an undue burden on MTA.

101.    Ms. Wooten asked if she had to call in every day while she was out sick with "no time".

102.    Mr. Somerville told Ms. Wooten that her doctor's note would suffice and that she should focus on just getting better.

103.    Ms. Wooten thanked Mr. Somerville, and they both hung up.

104.    Ms. Wooten spoke to Mr. Pike again on September 29, 2021. They discussed her test results, the length of her quarantine, and contact tracing.

105.    Ms. Wooten apologized to Mr. Pike for being so upset when they spoke the previous day.

106.    Ms. Wooten told Mr. Pike that several days previously, Darcy Rose hugged her (Ms. Wooten) in her office space.

107.    Ms. Wooten did not "hang up" on Mr. Pike.

108.    Ms. Wooten emailed her doctor's note to Mr. Pike on September 29, 2021.

109.    Ms. Wooten's symptoms got steadily worse.

110.    On October 1, 2021, Ms. Wooten went to the emergency department with a five-day fever. She also had diarrhea.

111.    On October 3, 2021, Ms. Wooten went to the emergency department again by ambulance. She was disoriented, confused and unstable with walking. She also had a cough, diarrhea, and a severe headache.

112.    On October 4, 2021, Ms. Wooten returned to the emergency department. Her oxygen saturation level was dangerously low when she arrived.

113.    That day, Ms. Wooten was admitted to the hospital and to the Intensive Care Unit due to COVID-19 respiratory failure and myocarditis which caused supraventricular tachycardia. She had what her medical providers called "Covid Lung".

114.    Without treatment, Ms. Wooten could have suffered heart failure and sudden death from COVID-19.

115.    MTA claims that Ms. Thompson told Ms. Wooten that she needed to, or was supposed to, return to work on October 10, 2021, which is not true. Ms. Wooten was in the ICU at St. Mary's Hospital on that date.

116.    Ms. Wooten was discharged from the hospital on October 18, 2021.

117.    Ms. Wooten still relied on supplemental oxygen when she was discharged and was taking two new medications (hydrochlorothiazide and metoprolol) for her heart. She was

still extremely fatigued, weak, and short-winded. Ms. Wooten had cognitive issues, slurred speech, and was less articulate than before she contracted Covid. Ms. Wooten also experienced depression. The ordeal was traumatizing; she almost lost her life. She struggled to keep her oxygen levels up and her heart rate down.

118.    Ms. Wooten needed home health care services when she was discharged. Androscoggin Health Care provided in-home care including physical and occupational therapy. They taught Ms. Wooten to use supplemental oxygen; how to exercise without overly exerting herself; and how to speak without becoming winded.

119.    Ms. Wooten's COVID-19 infection was a disability under the MHRA and ADA.

120.    On October 20, 2021, Ms. Thompson contacted Ms. Wooten by telephone to ask about her status.

121.    Ms. Wooten told Ms. Thompson that she was just released from the hospital and still using supplemental oxygen and receiving home healthcare.

122.    Ms. Thompson acknowledged having heard that Ms. Wooten was in the hospital.

123.    Ms. Wooten told Ms. Thompson that she was seeing her doctor again on October 26, 2021 and that she would let Ms. Thompson know the status of her return to work at that time.

124.    MTA claims that, during Ms. Thompson's phone call with Ms. Wooten on October 20, Ms. Thompson told Ms. Wooten that she was expected to return to work around October 10 and that no additional doctor's notes were received from Ms. Wooten.

125.    In fact, Ms. Thompson did not say anything to Ms. Wooten about an expected return to work date.

126.    In addition, Ms. Wooten submitted four doctor's notes to MTA dated September 28, 2021, October 6, 2021, October 26, 2021, and November 18, 2021.

127.    Ms. Thompson did not warn Ms. Wooten that she would be terminated if she did not return to work by a certain date.

128.    No one warned Ms. Wooten that she would be terminated if she did not return to work by a certain date.

129.    Ms. Wooten saw her doctor again on October 26, 2021 and emailed a doctor's note to Ms. Thompson after the visit.

130.    The note stated that Ms. Wooten had been ill due to COVID since September 28, 2021 and hospitalized from October 4 to 18, 2021. The note indicated that Ms. Wooten was being weaned from supplemental oxygen and was going to be reevaluated.

131.    Ms. Wooten had physical and occupational therapists helping her learn to use oxygen at home and preparing her to return to work.

132.    On October 28, 2021, Ms. Thompson called again to ask Ms. Wooten about her status. Ms. Wooten provided Ms. Thompson with a copy of her latest doctor's note. Ms. Thompson did not tell Ms. Wooten that she was in jeopardy of losing her job.

133.    On November 2, 2021, Ms. Carrier mailed a termination letter to Ms. Wooten stating that her termination was non-disciplinary. Ms. Carrier wrote that Ms. Wooten had been out of work continuously since September 27, 2021. Ms. Carrier did not indicate that Ms. Wooten's medical leave was an undue burden on MTA.

134.    Ms. Wooten had not received the termination letter yet when, on November 3, 2021, Ms. Wooten called and spoke to Ms. Thompson.

135.    During the November 3, 2021 phone call, Ms. Thompson asked how Ms. Wooten was doing. Ms. Wooten told Ms. Thompson that she was getting better and looking forward to coming back to work. Ms. Thompson told Ms. Wooten that she had been terminated, effective

the previous day, November 2. Ms. Wooten asked Ms. Thompson why she was not given any

warning. Ms. Wooten asked if MTA would please reconsider her termination. Ms. Thompson

told Ms. Wooten she would ask Ms. Carrier. Ms. Wooten did not "hang up" on Ms. Thompson as

alleged by MTA.

136.    Neither Ms. Carrier nor anyone else from MTA called Ms. Wooten back

regarding her request for reconsideration.

137.    Ms. Wooten would have been willing and able to return to work before November

2, 2021, using supplemental oxygen if she had been told that she was going to be terminated for

failure to return to work.

138.    As of November 18, 2021, Ms. Wooten's blood oxygen levels and her heart had

improved with medication.

139.    Ms. Wooten's medical provider wrote a note releasing her to return to work

without restrictions as of November 19, 2021. The note was faxed to MTA.

140.    Ms. Carrier emailed Ms. Wooten on November 18, 2021, apparently after getting

the fax from her doctor. Ms. Carrier attached a copy of the termination letter dated November 2,

and wrote:

> "On November 2, 2021 we sent you a certified letter notifying you of your non-disciplinary
> termination. It appears you have yet to receive it, so I am attaching a copy for you….I would
> strongly encourage you to contact MPERS (phone number omitted) with regard to your
> retirement benefits. If you are in fact eligible, as we believe you are, paid retiree health
> insurance will be available as well as other earned retirement benefits."

141.    Ms. Carrier encouraged Ms. Wooten to retire because she regarded Ms. Wooten

as too old and too disabled to continue working.

142.    At the time Ms. Wooten was terminated and asked to return to work there was still a need for Ms. Wooten to perform the duties she had performed prior to her termination and so MTA could have easily permitted her to return to work without any issues.

143.    At the time Ms. Wooten was terminated and asked to return to work there were many temporary employees working in the E-ZPass department.

144.    MTA could have easily reinstated Ms. Wooten and displaced one of the contingent workers but instead, MTA replaced Ms. Wooten with a temporary worker.

145.    Ms. Wooten called Ms. Carrier on November 19, 2021 and left a message asking to return to work. Ms. Carrier did not return Ms. Wooten's call.

146.    After Ms. Wooten was terminated, she applied for dozens of jobs including customer service jobs advertised by Rock Coast Personnel.

147.    Upon information and belief, one of the jobs Ms. Wooten applied for, advertised by Rock Coast Personnel, was a Customer Service job with the MTA E-ZPass department. Ms. Wooten was not contacted for an interview.

148.    During the MHRC's investigation of Ms. Wooten's Complaint/Charge of Discrimination, MTA did not provide a legitimate, non-discriminatory reason for not rehiring Ms. Wooten through Rock Coast Personnel.

149.    In response to the MHRC's request for information about Ms. Wooten's applications for jobs through Rock Coast Personnel, MTA merely stated that "Rock Coast Personnel is not associated with the MTA and it therefore does not have this information."

150.    MTA has an ongoing relationship with Rock Coast Personnel for the recruitment of toll collectors. See https://www.maineturnpike.com/About-MTA/Employment.aspx.

151.    Upon information and belief, MTA utilizes Rock Coast Personnel to fill long-term temporary positions that turn into full-time positions in the E-ZPass department.

152.    MTA refused to rehire Ms. Wooten when she applied for a CSR job advertised by Rock Coast Personnel on behalf of the MTA.

153.    Upon information and belief, other employees were out of work using "no time" during the same time frame as Ms. Wooten but she was the only one terminated.

154.    Upon information and belief, other employees were informed about the amount of "no time" they were granted. They were treated better than Ms. Wooten because they were on notice that if they did not return to work by a certain date, they could be terminated.

155.    MTA did not fire similarly situated CSRs who are much younger than Ms. Wooten. For example:

a.  Darcy Rose used FML when she and her wife had a baby earlier in 2021. Ms. Rose caught COVID-19 and was out for several more weeks than Ms. Wooten was because she was injured in a fall and broke her front teeth and nose.

b.  Joe Bureau sat across from Ms. Wooten in the E-ZPass office. He sneezed, coughed, blew his nose, and lost his voice for two days before he took medical leave.[2] He was out for several weeks with COVID-19. Mr. Bureau may have caught COVID-19 from James Pace.

c.  Ms. Wooten was in contact with Ms. Rose and Mr. Bureau before she contracted COVID-19.

d.  Ms. Rose and Mr. Bureau were retained by MTA.

---

[2] Ms. Wooten's successful Workers' Comp claim was based on her exposure to Mr. Bureau during the two days when he was at work in close contact with Ms. Wooten, with active COVID-19 symptoms.

156.     In its submission to the MHRC, MTA appeared to fault Ms. Wooten for not volunteering to work during March and April 2020 when hourly employees were placed on paid administrative leave.

157.     Ms. Wooten was understandably cautious about working in the office during March and April 2020 having been sick with the flu that spread through the department in January 2020. As noted above, Ms. Wooten was allowed to use "no time" during her January 2020 absences.

158.     MTA neglected to mention to the MHRC that Ms. Wooten continued to work during the COVID-19 outbreak in the department in the autumn of 2021, without the added compensation that employees earned in early 2020. Ms. Wooten was one of only five left in the department who were not sick or quarantining. She worked overtime for MTA to cover for her coworkers while still completing her college coursework.

159.      Plaintiff was 61 years old at the time she was discharged from employment with MTA.

160.     Plaintiff's COVID-19 illness was a disability under the ADA and MHRA. She almost died. Her infection was a disability particularly when viewed in the absence of mitigating measures, and substantially limited major life activities including breathing and the functioning of her respiratory system, the functioning of her cardiac system, walking, eating and caring for herself.

161.     Ms. Wooten also had a serious health condition under the FMLA and MFMRR as well as a record of disability under the ADA and MHRA due to her severe orthopedic disease requiring hospitalization and hip replacement surgery.

162.    Ms. Wooten engaged in protected activity when she exercised her rights under the FMLA and MFMLR.

163.    Ms. Wooten engaged in protected activity when she exercised her rights under the ADA and the MHRA by requesting reasonable accommodations.

164.    Ms. Wooten engaged in protected activity when she reported to MTA, in good faith, what she had reasonable cause to believe was an unsafe practice, e.g., keeping the MTA offices open to the public during the COVID-19 pandemic, allowing the public to use restrooms that employees also used, and allowing sick employees to come to work.

165.    Ms. Wooten was treated differently and worse than younger, non-disabled coworkers and was terminated because of disability discrimination and age discrimination.

166.    Ms. Wooten was terminated due to retaliation for exercising her rights under the MHRA, ADA, WPA, FMLA, and MFMLR.

167.    Ms. Wooten's protected class status and protected activities were a factor that made a difference in her termination.

168.    MTA failed to engage in the interactive process that would have enabled Ms. Wooten to return to work before November 2, 2021 and avoid termination. Among other things, MTA refused to permit Ms. Wooten to work remotely like other MTA employees, MTA did not warn Ms. Wooten that she would be terminated if she did not return to work before that date. MTA did not ask if Ms. Wooten could work with reasonable accommodation, e.g., permission to work from home or the ability to return to work while using supplemental oxygen.

169.    MTA failed to accommodate Ms. Wooten by providing her with unpaid leave until she was able to return to work in the office.

18

170.    MTA denied Ms. Wooten education benefits due to age and disability discrimination. MTA did not deny this allegation in its response to Ms. Wooten's MHRC and EEOC Complaint/Charge.

171.    MTA also denied Ms. Wooten education benefits due to FMLA and MFMLR retaliation.

172.    MTA failed and refused to rehire Ms. Wooten as a contingent worker because of disability and age discrimination and because of MHRA and ADA retaliation, FMLR and MFMLR retaliation, and whistleblower retaliation.

173.    MTA's unlawful discrimination and retaliation is evidenced by probative timing.

174.    MTA's unlawful discrimination and retaliation are evidenced by the animus of MTA's managers towards Ms. Wooten.

175.    MTA's unlawful discrimination and retaliation are evidenced by the fact that MTA has dissembled the facts and provided pretextual explanations for its adverse actions.

176.    In addition to causing Ms. Wooten economic damages, Defendant's discrimination and retaliation has caused Ms. Wooten substantial stress, anxiety, and humiliation and other non-economic damages.

177.    Defendant knowingly violated Plaintiff's state and federal rights and/or violations Plaintiff's rights with reckless indifference and so are liable for punitive damages.

<u>COUNT I: MHRA – Age Discrimination</u>

178.    Paragraphs 1-177 are incorporated by reference.

179.    Defendant has engaged in unlawful age discrimination.

<u>COUNT II: MHRA – Disability Discrimination</u>

180.    Paragraphs 1-179 are incorporated by reference.

19

181.    Defendant has engaged in unlawful disability discrimination.

### COUNT III: MHRA – Failure to Accommodate

182.    Paragraphs 1-181 are incorporated by reference.

183.    Defendant's conduct violated its duty under the MHRA to engage in the interactive process and to provide reasonable accommodations.

### COUNT IV: MHRA – Retaliation

184.    Paragraphs 1-183 are incorporated by reference.

185.    Defendant's conduct violated the MHRA's prohibition against interfering with any individual in the exercise or enjoyment of the rights granted under the MHRA.

### COUNT V: WPA Retaliation

186.    Paragraphs 1-185 are incorporated by reference.

187.    Defendant's conduct violated the WPA's prohibition against discharging an employee because the employee engaged in protected activity under the WPA, as enforced through the MHRA.

### COUNT VI: ADA

188.    Paragraphs 1-187 are incorporated by reference.

189.    Defendant engaged in unlawful disability discrimination.

### COUNT VII: ADA – Failure to Accommodate

190.    Paragraphs 1-189 are incorporated by reference.

191.    Defendant's conduct violated its duty under the ADA to engage in the interactive process and to provide reasonable accommodations.

### COUNT VIII: ADA Retaliation

192.    Paragraphs 1-191 are incorporated by reference.

193.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising her rights under the ADA.

## COUNT IX: ADEA

194.    Paragraphs 1-193 are incorporated by reference.

195.    Defendant engaged in unlawful age discrimination.

## COUNT X: FMLA Retaliation

196.    Paragraphs 1-195 are incorporated by reference.

197.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising her rights under the FMLA.

## COUNT XI: MFMLR Retaliation

198.    Paragraphs 1-197 are incorporated by reference.

199.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising her rights under the MFMLR.


## PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of her rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate her rights;

C.    Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D.    Order Defendant to pay for Plaintiff's educational expenses;

E.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

F.      Award equitable-relief for back pay, benefits and prejudgment interest;

G.      Award compensatory damages in an amount to be determined at trial;

H.      Award punitive damages in an amount to be determined at trial;

I.      Award liquidated damages in an amount to be determined at trial;

J.      Award damages equal to $100 per day for each day that Defendant is in violation of the MFMLR;

K.      Award nominal damages;

L.      Award attorney's fees, including legal expenses, and costs;

M.      Award prejudgment interest;

N.      Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability, age, and protected activity under the FMLA, MFMLR, ADA, ADEA, MHRA, or WPA;

O.      Require Defendant to mail a letter to all employees notifying them of the verdict against them and stating that Defendant will not tolerate discrimination in the future;

P.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

Q.      Require that Defendant train all management level employees on the protections afforded by the FMLA, MFMLR, ADA, ADEA, MHRA, or WPA;

R.      Require that Defendant place a document in Plaintiff's personnel file which explains that Defendant unlawfully terminated her because of unlawful discrimination and retaliation; and

S.      Grant to Plaintiff such other and further relief as may be just and proper.

Dated: May 3, 2023                          _/s/_ Chad T. Hansen _____
                                            Attorney for the Plaintiff

                                            EMPLOYEE RIGHTS GROUP
                                            92 Exchange Street 2nd floor
                                            Portland, Maine 04101
                                            Tel. (207) 874-0905
                                            Fax (207) 874-0343
                                            Chad@EmployeeRightsLaw.Attorney